AUSA:      Alyse Wu          Telephone:  (313) 226-9589
AO 91 (Rev. 11/11)  Criminal Complaint                    Special Agent:      Elizabeth Messenger, DOL     Telephone:  (313) 408-7034

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

United States of America
   v.

**D-1 Michael Davis,**
**D-2 Rachelle Pritchard**

Case No.

Case: 2:24−mj−30496
Assigned To : Unassigned
Assign. Date : 11/20/2024
Description: CMP USA V. SEALED
(DA)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____March 2020 through January 2024_____ in the county of _____Oakland_____ in the
_____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire fraud. |
| 18 U.S.C. § 1028A | Aggravated identity theft. |
| 18 U.S.C. § 1349 | Conspiracy to commit wire fraud. |
| 18 U.S.C. § 287 | False claims. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_Elizabeth Messenger_
_Complainant's signature_

Elizabeth Messenger, Special Agent, DOL-OIG
_Printed name and title_

Sworn to before me and signed in my presence
and/or by reliable electronic means.

_Elizabeth A. Stafford_
_Judge's signature_

Date:  November 20, 2024

City and state:  Detroit, MI

Hon. Elizabeth A. Stafford, United States Magistrate Judge
_Printed name and title_

## <u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT</u>

I, Elizabeth Messenger, being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION</u>

1.      I am a Special Agent of the U.S. Department of Labor, Office of Inspector General, Office of Investigations – Labor Racketeering and Fraud (**DOL-OIG/OI-LRF**) and have been so employed since September of 2022.  I am currently assigned to the Detroit Field Office of DOL-OIG.  Prior to this assignment, I was an Investigator of the U.S. Department of Labor, Office of Labor Management Standards (**DOL-OLMS**) for six years.  I have additional experience and training from the Federal Law Enforcement Training Center (**FLETC**) where I graduated from the Criminal Investigator Training Program (**CITP**). In both my current and former positions, I participated in joint investigations concerning violations of law relating to financial crimes and unemployment insurance fraud schemes with other state and federal investigators.  Based on my direct personal experience with these cases and through interaction with seasoned agents, I have become familiar with the methods that criminals use to attack and exploit the unemployment insurance systems as well as tools and methods criminals often utilize to facilitate that fraud. I also know that criminals may employ similar tools and methods to exploit other government programs, such as tax relief programs administered by the Internal Revenue Service.

2.     I make this affidavit based upon personal involvement in the subject criminal investigation, including the review of financial, employment, internet service provider, utility, and property records; records from the State of Michigan regarding unemployment insurance claims; law enforcement surveillance information; and other information and evidence obtained during the investigation. I have also been provided with information from other law enforcement agents and officials from the Federal Bureau of Investigation (**FBI**), Internal Revenue Service Criminal Investigation (**IRS-CI**), and State of Michigan's Fraud and Investigation Unit (**SOM-FIU**).  This affidavit does not contain all of the facts developed to date in the underlying investigation and is being submitted for the limited purpose of establishing probable cause in support of a complaint to believe that MICHAEL DAVIS (**DAVIS**, DOB XX/XX/1979) and RACHELLE PRITCHARD (**PRITCHARD**, DOB XX/XX/1988) have violated 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1028A (aggravated identity theft), and 18 U.S.C. § 1349 (conspiracy to commit wire fraud); and that DAVIS has additionally violated 18 U.S.C. § 287 (False Claims).

## Summary of the Investigation

3.     The DOL-OIG and law enforcement partners are investigating DAVIS and PRITCHARD in relation to a scheme involving pandemic unemployment insurance (UI) fraud and tax refund fraud.  The federal investigation began in

March 2023, when the DOL-OIG received a report from the State of Michigan

Fraud Investigations Unit (SOM-FIU) that it appeared DAVIS and PRITCHARD

had conspired together to file fraudulent UI claims in the names of more than 100

individuals, resulting in the outlay of approximately $1,900,000 in UI benefits.

The federal investigation also revealed that DAVIS fraudulently obtained

approximately $1 million of Employee Retention Credits (ERC), a refundable tax

credit offered to certain eligible businesses and tax-exempt organizations affected

during the COVID-19 pandemic.  DAVIS accomplished this by providing fictitious

payroll journals and false tax records to a return preparer, which were used to

prepare and submit the false tax returns to the IRS.

    4.    As described further below, between March 2020 and June 2020,

approximately 122 UI claims were filed using the same Internet Protocol (IP)

address.  Based on my training and experience, I know that a large volume of

claims from a single IP address with numerous unique individuals' names and

social security numbers is a strong indicator that the claims are fraudulent.

Submitted with most of those claims were purported IRS Form 1099s that listed

many of the same sources of income, another indicator of fraud.  Some of the

named sources of income were discovered to be businesses owned by DAVIS.  In

addition, among other things, both DAVIS and PRITCHARD were captured on

ATM footage withdrawing money and/or checking account balances on debit cards

in other individuals' names to which unemployment benefits were loaded, which is also indicative of fraud.  Federal agents conducted interviews of many of the individuals whose personal identifying information (PII) was used to file the UI claims—each of them confirmed that they had not filed for UI during the fraud period, nor had they authorized anyone to do so on their behalf.  It appears that DAVIS and PRITCHARD may have obtained some of the PII used via PRITCHARD's employment at Rock Connections LLC.

5.      During the course of the federal investigation, investigating agents learned that Michigan State Police (MSP) were conducting their own investigation into DAVIS's involvement in another fraud and identity theft scheme, and had obtained a search warrant for DAVIS and PRITCHARD's residence and seized electronic devices.  MSP subsequently informed IRS-CI agents that tax records were found during MSP's search of the residence.  During a voluntary interview with DAVIS on January 26, 2024, federal agents requested consent from DAVIS to search the electronic devices, which DAVIS voluntarily provided.  However, DAVIS also told agents that some of the devices, specifically the computers, were shared among household members (including DAVIS, PRITCHARD, and the children living in the home); this appeared to be confirmed by a preliminary search of the devices.  Out of an abundance of caution, agents obtained a federal search warrant to search the electronic devices.  The devices were found to contain

material that appeared to be evidence of the UI fraud scheme, related to both DAVIS and PRITCHARD's involvement.

6.     During the voluntary interview with agents, DAVIS also told agents that he enlisted the assistance of a third-party return preparer, ERC Specialists, to prepare and submit tax returns to the IRS in connection with ERC claims. The investigation found that some of the PII that was used to submit the false UI claims to the State of Michigan was also used in fictitious payroll journals that DAVIS submitted to ERC Specialists, which ERC Specialists used to create and submit tax forms necessary to obtain ERC funds. The investigation found that DAVIS's businesses were not operational and did not employ any employees or pay any wages to any employees during the COVID-19 pandemic and, therefore, were not entitled to obtain ERC funds.

## PROBABLE CAUSE

### Unemployment Insurance Scheme

*Background & COVID-19*

7.     The Social Security Act of 1935 initiated the federal and state UI system.  The system provides benefits to individuals who are unemployed.  The purpose of the UI system is twofold: first, to lessen the effects of unemployment through cash payments made directly to laid-off workers, and second, to ensure that life necessities are met on a weekly basis while the worker seeks employment.

In the state of Michigan, the UI system is administered by the State of Michigan's Unemployment Insurance Agency (SOM-UIA).

8.      As a result of the COVID-19 pandemic, from approximately March 2020 and through September 2021, the U.S. Government provided federal funds to the states, including the State of Michigan, to supplement unemployment benefits through multiple government programs.  Those government programs include, but are not limited to, the Families First Coronavirus Response Act (FFCRA); Coronavirus Aid, Relief, and Economic Security (CARES) Act; American Rescue Plan Act of 2021 (ARPA); and Lost Wages Assistance Program (LWAP).

9.      Normally, in the absence of fraud, an individual initiates an unemployment claim by submitting a claim in person, over the telephone, or on the internet through the State Workforce Agency (SWA) website.  Currently, most UI claims in Michigan are filed online via the Internet through the Michigan Unemployment Insurance Agency's (MUIA) portal.  In order to qualify for UI benefits, the claimant must demonstrate a certain level of earnings in several quarters immediately preceding the application.  The amount of unemployment benefits the UI claimant qualifies for depends on a variety of factors, including but not limited to, the length of his or her previous employment and the amount of wages he or she earned.

10.     The SWA will approve or reject a UI claim based on the application and information provided by the claimant.  If the SWA approves a UI claim, the claimant is required to re-certify the claim via telephone or internet at various times throughout the claim process.  The claimant must also certify that he or she is still unemployed and actively seeking work.

11.     Once an application is approved, the SOM provides unemployment benefits through either: 1) a Bank of America (BOA) issued debit card mailed to the claimant through the U.S. Postal Service, or 2) direct deposit through electronic fund transfers (EFTs) to a bank account number provided by the claimant.   The EFTs originate from one or more accounts maintained by the MUIA at BOA. BOA is a financial institution as defined by 18 U.S.C. § 20.

12.     All EFTs of unemployment insurance benefits to Michigan unemployment insurance claimants, whether through a debit card or bank account, involve interstate wire communications through the transmission of electronic signals from BOA's two data centers located in Virginia and Colorado.  BOA also uses their data centers to process all transactions made on UI debit cards, including the loading of funds onto the cards, point of sale transactions, checking card balances, and ATM withdrawals.  As a result, all successful UI benefit claims filed in Michigan result in interstate wire transmissions to and/or from states outside of the state of Michigan to pay UI benefits.

13.     In an effort to prevent and otherwise inhibit fraud, the SWA website captures certain data surrounding the interaction between an individual and the UI system.  Each SWA has its own unique system.  The SOM-UIA uses the Michigan Integrated Data Automated System (MiDAS).  Each time a claim is accessed, MiDAS creates a digital footprint by collecting data including dates, times, IP addresses, and Media Access Control (MAC) addresses associated with a device accessing a claim.  The SWA and SOM systems tie this information to the user-entered information captured to facilitate the claim (i.e., name, address, social security number, BOA or other bank account numbers, bank routing numbers, etc.).  It is through the analysis of this data that the SWAs and investigating agents can identify fraudulent trends and tendencies associated with certain claims.

14.     MiDAS also utilizes certain proprietary algorithms that automatically identify and stop possible fraud based on whether or not a claim exhibits fraudulent indicators that exceed a designated threshold.  Furthermore, humans who review claims can also take actions to stop payments of claims should they conclude that the payments may be involved in fraud.  Investigators from the SOM-FIU have the ability to access and review the data maintained for both external actors and employees in MiDAS.  It is through the analysis of this data that investigating agents can identify fraudulent trends and tendencies associated with certain claims.

*DAVIS*

15.     Utilizing MiDAS, SOM-FIU investigators identified that IP address

68.36.157.160 (IP 160) was used to file at least 122 UI claims between March

2020 and June 2020, including claims filed in the names of DAVIS and

PRITCHARD.  While subscriber information was not available for IP 160, open

source information indicated that it is a static IP address in southeast Michigan;

DAVIS and PRITCHARD reside in southeast Michigan.  As a result of those

filings, more than $1,900,000 in UI benefits were paid.

16.     IRS Form 1099s were filed with many of those claims, listing many of

the same sources of income and using similar markings.  Based on my training and

experience, I know that a high volume of claims filed using the same IP address

and listing similar or the same employers on IRS Form 1099s is indicative of fraud.

Typically, in the absence of fraud, the number of claims filed from a single IP

address would not exceed much more than the number of individuals living in a

single residence.  Moreover, in most instances, the sources of income would be

diversified.  Further investigation confirmed the fraudulent nature of claims filed

using IP 160.

17.     For example, on May 6, 2020, a UI claim was filed with the State of

Michigan in the name of M.L. using IP 160.  IRS Form 1099 was submitted with

M.L.'s claim, listing Corktown Hospitality LLC as a source of income.

**Figure 1**

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | | 1 Rents $ | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|---|
| **CORKTOWN HOSPITALITY LLC**<br>**1444 MICHIGAN AVE**<br>**DETROIT, MI 48216** | | 2 Royalties $ | 2019<br>Form **1099-MISC** | |
| | | 3 Other income $ | 4 Federal income tax withheld $ | Copy B<br>For Recipient |
| PAYER'S TIN ▮▮▮ | RECIPIENT'S TIN ▮▮▮ | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ | |
| RECIPIENT'S name ▮▮▮ | | 7 Nonemployee compensation $        52334.00 | 8 Substitute payments in lieu of dividends or interest $ | This is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| Street address (including apt. no.)<br>**3297 HELEN** | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| City or town, state or province, country, and ZIP or foreign postal code<br>**DETROIT,  MI 48207** | | 11 | 12 | |
| Account number (see instructions) | FATCA filing requirement ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $<br>$ | 17 State/Payer's state no. | 18 State income $<br>$ |

Form **1099-MISC**          (keep for your records)          www.irs.gov/Form1099MISC          Department of the Treasury - Internal Revenue Service

18.     During a voluntary interview between DAVIS and investigating agents on January 26, 2024, DAVIS confirmed he was the owner of Corktown Hospitality LLC.  Agents also interviewed M.L., who stated he did not file a UI claim in Michigan in May 2020 and did not authorize anyone to do so on his behalf.  Moreover, M.L. had never worked at, nor heard of, Corktown Hospitality LLC.

19.     SOM-FIU investigators obtained ATM footage for transactions made on the Bank of America debit card to which unemployment benefits were loaded for the claim filed in M.L.'s name.  On July 6, 2020, at approximately 23:59, an

individual believed to be DAVIS was captured on ATM footage withdrawing $1,000 from the claimant account in M.L.'s name:

**Figure 2**



20.    On July 7, 2020, at approximately 22:42, an individual believed to be DAVIS was captured on ATM footage checking the balance on the debit card associated with M.L.'s claim:

**Figure 3**



21.    In addition, on May 8, 2020, a UI claim was filed with the State of Michigan in the name of A.M. using IP 160.  IRS Form 1099 was submitted with A.M.'s claim, listing Corktown Hospitality LLC as a source of income (see Figure

4 below).  Agents noted both M.L. and A.M.'s claims listed the same employer, as well as the similarity in the font and color of the IRS Form 1099s.

**Figure 4**



22.    Agents interviewed A.M., who stated she did not file a UI claim in Michigan and did not authorize anyone to do so on her behalf.  Moreover, A.M. had never worked at, nor heard of, Corktown Hospitality LLC.

23.    SOM-FIU investigators obtained ATM footage for transactions made on the Bank of America debit card to which unemployment benefits were loaded for the claim filed in A.M.'s name.  On November 18, 2020, at approximately

23:17, an individual believed to be DAVIS was captured on ATM footage

withdrawing $720 from the claimant account in A.M.'s name:

**Figure 5**



24.     As a further example, on April 27, 2020, a UI claim was filed with the

State of Michigan in the name of S.T. using IP 160.   IRS Form 1099 was

submitted with S.T.'s claim, listing I Luv Cheese Sterling Heights as a source of

income (see Figure 6 below).  Agents noted the similarity in the font and color of

the IRS Form 1099 submitted with M.L., A.M., and S.T.'s claims, as well as

several other claims filed using IP 160.

**Figure 6**



| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | | 1 Rents $ | OMB No. 1545-0115 2019 | Miscellaneous Income |
|---|---|---|---|---|
| I LUV CHEESE STERLING HEIGHTS 40850 VAN DYKE AVE STERLING HTS, MI 48313 | | 2 Royalties $ | Form 1099-MISC | |
| | | 3 Other income $ | 4 Federal income tax withheld $ | Copy B For Recipient |
| PAYER'S TIN | RECIPIENT'S TIN | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ | |
| RECIPIENT'S name | | 7 Nonemployee compensation $ 48683.00 | 8 Substitute payments in lieu of dividends or interest | This is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| Street address (including apt. no.) 3970 Leroy Blvd | | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ | 10 Crop insurance proceeds $ |
| City or town, state or province, country, and ZIP or foreign postal code Ann Arbor, MI 48103 | | 11 | 12 | |
| Account number (see instructions) | | FATCA filing requirement ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ | 17 State/Payer's state no. | 18 State income $ |

Form **1099-MISC**      (keep for your records)      www.irs.gov/Form1099MISC      Department of the Treasury - Internal Revenue Service

25.      Agents interviewed S.T., who stated he did not file a UI claim in Michigan and did not authorize anyone to do so on his behalf.  Moreover, S.T. had never worked at, nor heard of, I Luv Cheese Sterling Heights.

26.      SOM-FIU investigators obtained ATM footage for transactions made on the Bank of America debit card to which unemployment benefits were loaded for the claim filed in S.T.'s name.  On October 21, 2020, at approximately 22:42, an individual believed to be DAVIS was captured on ATM footage withdrawing $720 from the claimant account in S.T.'s name:

**Figure 7**



27.     Ultimately, from June 2020 through July 2021, Bank of America ATM footage captured the same individual (believed to be DAVIS) checking bank balances and making cash withdrawals in more than 280 instances from UI claimant accounts in other individuals' names, totaling more than $200,000. All of those claims were filed using IP 160.

28.     Although the individual in the ATM footage was wearing a facemask, agents believe him to be DAVIS because the same individual appears to match

16

DAVIS's description and his Michigan driver's license photograph (see Figure 8, below), was captured using the UI card filed in DAVIS's own name (see Figure 9, below), and used the same distinctive mask in two instances (see Figures 5 and 9).

**Figure 8**



(Michael Davis, Michigan Driver's License)

**Figure 9**

(Michael Davis UI Debit Card on July 9, 2021, at 08:14, Bank of America)

17

*Pritchard*

29.     The investigation also showed that PRITCHARD was involved in the fraudulent UI claim scheme.

30.     For example, on March 8, 2020, a UI claim was filed with the State of Michigan in the name of A.D. using IP 160.  IRS Form 1099 was submitted with A.D.'s claim, listing Corktown Hospitality LLC as a source of income (see Figure 10).  As previously explained, DAVIS told agents that he was the owner of Corktown Hospitality LLC.

**Figure 10**

31.     In addition, on May 15, 2020, a UI claim was filed with the State of Michigan in the name of D.H. using IP 160.  IRS Form 1099 was submitted with D.H.'s claim, listing Corktown Hospitality LLC as a source of income (see Figure 11).  A search in a law enforcement database confirmed that D.H. died on July 1, 2010.

**Figure 11**



32.     Additionally, on May 9, 2020, a UI claim was filed with the State of Michigan in the name of S.K. using IP 160.  IRS Form 1099 was submitted with S.K.'s claim, listing Riverwalk Holdings Midwest LLC as a source of income (see Figure 12).

19

**Figure 12**

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code. | | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|---|
| **RIVERWALK HOLDINGS MIDWEST LLC**<br>**625 SHELBY ST**<br>**DETROIT, MI 48226** | | $ | 20**19** | |
| | | 2 Royalties | Form 1099-MISC | |
| | | $ | | |
| | | 3 Other income | 4 Federal income tax withheld | Copy B |
| | | $ | $ | For Recipient |
| PAYER'S TIN | RECIPIENT'S TIN | 5 Fishing boat proceeds | 6 Medical and health care payments | |
| ████████ | ████████ | $ | $ | This is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. |
| RECIPIENT'S name | | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | |
| ████████ | | $          46,829.00 | $ | |
| Street address (including apt. no.)<br>**23659 Kessington** | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br>$ | |
| City or town, state or province, and ZIP or foreign postal code<br>**Taylor, MI 48180** | | 11 | 12 | |
| Account number (see instructions) | FATCA filing requirement ☐ | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16 State tax withheld<br>$<br>$ | 17 State/Payer's state no. | 18 State income<br>$<br>$ |

Form **1099-MISC**          (keep for your records)          www.irs.gov/Form1099MISC          Department of the Treasury - Internal Revenue Service

33.      Agents interviewed S.K.'s adult daughter, S.P., as S.K. had recently returned home from the hospital at the time of the interview.  S.P. stated S.K. did not file a UI claim in Michigan and did not authorize anyone to do so on her behalf.  Moreover, S.K. had never worked at Riverwalk Holdings Midwest LLC – S.K. worked for a marketing company and was never unemployed during the pandemic.

34.      Investigating agents and SOM-FIU investigators again noted the similarity in the font and color of the IRS Form 1099s submitted with A.D., D.H.,

and S.K.'s claims, as well as the IRS Form 1099s submitted with M.L., A.M, and S.T.'s claims.

35.     SOM-FIU investigators obtained Bank of America ATM footage, which captured PRITCHARD checking card balances on A.D., D.H., and S.K.'s claimant accounts in one series of transactions.  On July 26, 2020, at approximately 13:44:42, PRITCHARD checked the balance on S.K.'s claimant account.  At 13:45:13, PRITCHARD then checked the balance on A.D.'s claimant account.  Finally, at 1:45:41, PRITCHARD checked the balance on D.H.'s claimant account. (See Figures 13 and 14).

**Figure 13**



(Rachelle Pritchard, Michigan Driver's License)

**Figure 14**



36.     Bank records for A.D., D.H., and S.K.'s claimant accounts document that activity on those cards took place at many of the same dates, times, and locations.  For example, on July 16, 2020, at approximately 17:30, A.D.'s card was used for a purchase totaling $3.59 at a Shell Service Station in Oak Park, Michigan.  At approximately 17:32 and 17:35, S.K. and D.H.'s cards were used for purchases at the same Shell Service Station totaling $11.29 and $44.11, respectively. Based on my training and experience, the use of UI debit cards at the same dates, times, and locations, is a strong indication that one person was in possession of all three cards.  Moreover, one individual's possession of debit cards

held in the names of multiple other individuals indicates they were likely obtained and being used fraudulently.

37.     Additional UI claims filed using IP 160 paid benefits to bank accounts held in PRITCHARD's name.  For example, UI claims in the names of J.N. and S.C. paid benefits to a Current Bank Account in the name of PRITCHARD, with mailing address 1XXX3 Saint Mary's St., Detroit, MI 48235.  During a voluntary interview between investigating agents and PRITCHARD on February 7, 2024, PRITCHARD confirmed that 1XXX3 Saint Mary's St., Detroit, MI 48235 was her parents' address.  Moreover, agents interviewed J.N., who stated he has never filed for unemployment insurance in his entire life, nor did he authorize anyone to file a claim on his behalf.

38.     In addition, a claim filed using IP 160 in the name of D.G. paid benefits to a Goldman Sachs bank account.  SOM-FIU investigators obtained bank records for the account, which named PRITCHARD as the account holder and listed 1XXX3 Saint Mary's St., Detroit, MI 48235 as the mailing address.  Bank records documented that on May 6, 2020, May 18, 2020, July 1, 2020, and July 9, 2020, UI deposits were made for D.G.'s claim totaling $5,534, $962, $1,924, and $3,848, respectively.   Following the UI deposits, transfers were made to a Bank of America account (Account 8335), including a transfer of $5,000 from the Goldman Sachs bank account to Account 8335 on May 11, 2020.

39.     Agents interviewed D.G., who stated she has never filed a UI claim in Michigan or any other state, and did not authorize anyone to do so on her behalf. Moreover, D.G. has never held a bank account with Goldman Sachs.

40.     Agents obtained bank records for Account 8335, which named PRITCHARD as the account holder.  Bank records revealed that Account 8335 was accessed by IP 160 on April 23, 2020, May 9, 2020, and June 18, 2020.

41.     Agents conducted a search to identify PRITCHARD's previous employers leading up to, and during, the fraud period.  Agents learned that PRITCHARD was employed by Rock Connections LLC in 2020.  Rock Connections LLC is a sales and support platform specializing in contact center services that are used to connect with clients and improve sales conversions.  Some of Rock Connections LLC's services include lead generations and prequalifying clients.  Agents subpoenaed Rock Connections LLC to determine if: (1) through the course of her duties, PRITCHARD had access to individuals' PII; and (2) if any of the identities used to file UI claims with IP 160 were ever received or retained by Rock Connections LLC.  Rock Connections LLC confirmed that PRITCHARD was an Automotive Sales Consultant and had access to PII through the course of her duties.  Moreover, 33 of the claimants' names tied to IP 160 matched individuals' whose PII was received and/or retained through the course of their business activity. Additionally, D.H. and S.K., whose claimant debit cards

were in PRITCHARD's possession when she checked the account balances on July 26, 2020, were the names of individuals' whose PII were received or retained by Rock Connections LLC.

42.     Rock Connections LLC also provided training material that PRITCHARD would have received as an employee.  The training material identifies Rock Connections LLC's "Platinum Rule", which states to, "Protect our clients' and company's sensitive info as if it were your own personal information!" The training subsequently defines what sensitive information is and why Rock Connections LLC cares, shown in the images below:

**Figure 15**



**Figure 16**



43.     In addition, the electronic devices seized during MSP's aforementioned search warrant on October 3, 2023, and later obtained and searched via a federal search warrant by IRS-CI, revealed evidence related to both DAVIS and PRITCHARD's involvement in the UI fraud scheme.  For example, a photo was found on one of the seized computers (Apple Desktop Computer, Serial No. C02DK1J207DW) of a notepad with PII and place of work, Great Lakes Burger, for an individual named H.H.  A search of H.H.'s PII in a DOL-OIG database revealed that a UI claim was filed in the name of H.H. using IP 160, and an IRS Form 1099 was submitted listing Great Lakes Burger as H.H.'s employer.

Moreover, Rock Connections, LLC confirmed H.H. was an individual whose PII was received and retained by Rock Connections, LLC.

44.     The search of the Apple Desktop Computer, Serial No. C02DK1J207DW also revealed several screenshots of applications, which included applicants' PII.  Rock Connections LLC confirmed that those screenshots appeared in a similar format to application forms generated by RouteOne, a third-party technology vendor utilized by clients of Rock Connections, LLC during the time period that PRITCHARD was employed.

### *TAX REFUND FRAUD SCHEME*

#### *Employee Retention Credit Background*

45.     Following the outbreak of COVID-19, Congress enacted statutes authorizing the IRS to reduce the employment tax burdens of small businesses and reimburse those businesses for wages paid to employees who could not work because of the pandemic. For tax periods in 2020 and 2021, the IRS offered the Employee Retention Credit (ERC) and the Family and Medical Leave Act Credit (FMLA) to businesses that were significantly impacted by the pandemic. To be qualified, employers needed to, among other things, provide proof that their business was operational during the COVID-19 pandemic and had maintained employees and paid Form W-2 wages to employees throughout the pandemic. One way a business could apply for ERC funds was by submitting a Form 941-X to the

IRS. Form 941-X is a federal tax form used to amend Form 941, Employer's

QUARTERLY Federal Income Tax Return (Form 941).

*DAVIS's False Claims for ERC*

46.     During the voluntary interview on January 26, 2024, DAVIS told

agents that he knew the eligibility requirements of the ERC, which included proof

that a business had maintained employees and paid wages to employees during the

COVID-19 pandemic. DAVIS was aware that he could receive up to $26,000 per

employee. DAVIS also told agents that he knew exactly what tax forms were

required to obtain the ERC, which were the Forms 941.

47.     Business records maintained with the State of Michigan Licensing and

Regulatory Affairs (LARA) showed that DAVIS had 10 registered businesses prior

to 2019, including the business LE IVY.  LARA records showed that none of

DAVIS's businesses were in good standing until April 2021, when the COVID-19

relief for businesses became available. Around October 15, 2022, DAVIS enlisted

the assistance of ERC Specialists to prepare and submit Forms 941-X for several of

his businesses, including LE IVY, to obtain ERC funds. As part of the initial

application, DAVIS provided ERC Specialists with information pertaining to LE

IVY's purported operation and number of employees maintained during the

COVID-19 pandemic—specifically, that LE IVY was in the restaurant/lounge

industry, employed 30 full-time Form W-2 employees during 2020 and 2021, paid

W-2 wages and filed the Forms W-2 for wages paid for the 2020 and 2021 tax years.

48.     In an effort to prove those claims, DAVIS provided ERC Specialists with falsified original Forms 941 and fictitious payroll journals for LE IVY for the first, second, and third quarters of 2021.  DAVIS submitted the information electronically to ERC Specialists via an online portal and/or email. ERC Specialists is located in the State of Utah and utilizes a completely cloud-based workflow for their Online portal, which is managed by Google. Google does not maintain any servers in the State of Michigan.

49.     Using the information provided by DAVIS, ERC Specialists prepared three Forms 941-X for LE IVY for the first, second, and third quarters of 2021 and sent them to DAVIS for his review and signature. DAVIS utilized DocuSign software to electronically sign each of the Forms 941-X from I.P. address 172.58.122.124 (IP 124). While subscriber information was not available for IP 124, open-source information indicated that it is a static IP address in southeast Michigan; DAVIS resides in southeast Michigan. Additionally, during the voluntary interview on January 26, 2024, DAVIS told agents that he DocuSigned the tax returns he received from ERC Specialists. DocuSign does not maintain data center locations in the State of Michigan for its eSignature service.

50.     Once the Forms 941-X were electronically signed by DAVIS, ERC Specialists submitted them to the IRS. As a result, DAVIS received a total of three checks from the U.S. Department of the Treasury, containing a total of $330,831.31 of ERC, just for LE IVY. ERC Specialist also submitted Forms 941-X for DAVIS in connection with three other businesses in the same manner described above. As a result, DAVIS received an additional nine checks from the U.S. Department of the Treasury, containing an additional $734,545.14 of ERC. DAVIS ultimately received a total of approximately $1 million of fraudulently obtained ERC.

51.     During his interview on January 26, 2024, DAVIS told agents that he used $52,000 of ERC funds to purchase jewelry and $12,500 for his girlfriend in Georgia to start a business. During an interview with agents, that girlfriend told agents that the funds were really to help support a child they shared together. DAVIS also told agents that he used the ERC funds on personal expenses, not payroll or other business expenditures.

52.     DAVIS appeared to have used some of the same PII from the UI scheme in the tax fraud scheme. The investigation found a photo of a notepad containing the PII for an individual with the initials S.S. on one of the electronic devices seized by MSP (Apple Desktop Computer, Serial No. C02DK1J207DW) (See Figure 17). S.S.'s PII was used in several of the payroll journals submitted to

ERC Specialists to support the claim that DAVIS's purported business, LE IVY, maintained and paid employees throughout the COVID-19 pandemic and was eligible to receive ERC funds (See Figure 18). A UI claim was also filed in the name of S.S.'s using IP 160.  In an interview with federal agents, S.S. stated that he had no knowledge of LE IVY or DAVIS, had never been an employee of LE IVY, and never received any wages or Forms W-2 from LE IVY. S.S. also told agents that he had never filed an unemployment insurance claim in the State of Michigan and had never received any unemployment benefits.

**Figure 17**



**Figure 18**



53.     Review of the fictitious payroll journals submitted to ERC Specialists
and another third-party, ESMART Tax, also indicated that some of the same
individuals listed within the fictitious payroll journals were also identified by the
DOL-OIG as applicants for unemployment insurance claims, similar to S.S.
Federal agents conducted interviews of several of those individuals; each
individual who was interviewed told agents that they had no knowledge of the
business or DAVIS, had never been employed at the business, and had never
received any wages of Forms W-2 from the business or DAVIS. Additionally,

many of the individuals interviewed had never lived or worked in the State of Michigan.

54.    For example, as previously described in this affidavit, a UI claim was filed in the name of S.K. using IP 160.  PRITCHARD was captured on ATM footage checking the balance on the UI debit card held in S.K.'s name.  S.K.'s daughter confirmed S.K. never filed for unemployment insurance and did not authorize anyone to do so on her behalf.  Moreover, S.K.'s PII was confirmed to have, at some point, been received and/or retained, by Pritchard's former employer, Rock Connections, LLC, through the course of conducting business.  S.K.'s PII was also found in the fictitious payroll information submitted to a third-party (ESMART Tax) in an (unsuccessful) attempt to obtain ERC funds for DAVIS.

55.    Additionally, a UI claim was filed in the name of M.L. using IP 160.  On July 7, 2020, DAVIS was captured on ATM footage making a cash withdrawal of $1,000 using the UI card held in M.L.'s name.  Investigating agents interviewed M.L., who confirmed he did not file the UI claim and did not authorize anyone to do so on his behalf.  Rock Connections confirmed that M.L.'s PII was received and/or retained through the course of conducting business.  M.L.'s PII was found in fictitious payroll information that was submitted to a third-party (ESMART Tax) in an (unsuccessful) attempt to obtain ERC funds for DAVIS.

## CONCLUSION

56.     Based on the foregoing, there is probable cause to believe that DAVIS

and PRITCHARD have committed wire fraud in violation of 18 U.S.C. § 1343,

aggravated identity theft in violation of 18 U.S.C. § 1028A, and conspiracy to

commit wire fraud in violation of 18 U.S.C. § 1349, in connection with an

unemployment insurance fraud scheme.  Additionally, there is probable cause to

believe that DAVIS committed wire fraud in violation of 18 U.S.C. §1343 and false

claims in violation of 18 U.S.C. § 287, in connection with a tax refund fraud

scheme.

_____
Elizabeth Messenger
Special Agent
DOL-OIG


Sworn to before me and signed
in my presence and/or by reliable electronic means.


Hon. Elizabeth A. Stafford
United States Magistrate Judge


Dated:   November 20, 2024